IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | 4:06CR3159 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| LINNIE J. JANIGON, | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court on the Magistrate Judge's Recommendation (filing 29) that the defendant's motion to suppress (filing 18) be denied for the reasons stated at the close of the suppression hearing (filing 31, Tr. of Suppression Hr'g, 67:24-70:17 (hereinafter "Tr."). The defendant objected to the Recommendation. After de novo review of the Magistrate Judge's Recommendation pursuant to 28 U.S.C. § 636(b)(1) and NECrimR 57.3, I conclude that the Magistrate Judge's Recommendation should be adopted, the defendant's objection (filing 32) to the Recommendation should be denied, and the defendant's motion to suppress (filing 18) should be denied. As the reasons for the Recommendation were orally explained and not in writing, I summarize the facts and briefly explain the reasons for denying the motion to suppress.

*I.*

Janigon's motion to suppress asserts that he was arrested without probable cause and unlawfully detained, and that any statements made or evidence seized after the allegedly unlawful arrest are fruit of the poisonous tree which must be suppressed. (Tr. 3:2-6.) I find that the following facts were established at the suppression hearing.

Shortly before midnight on August 4, 2006, two Lincoln police officers were dispatched to Mum's Liquor at the corner of 22nd and "O" Streets in Lincoln,

Nebraska on the report of "a black male, tall, skinny, blue shirt, gray sweatpants, carrying a black handgun just entered the store, arrived in a white vehicle with a passenger." (Tr. 4:17-5:18; 15:24-16:1 (grammar and punctuation as in the transcript).) Officer Kocian was not one of the officers dispatched to the liquor store, but he responded because he was only five blocks away. Officer Kocian was the first to arrive on the scene. (Tr. 4:15-16, 6:3-5; 16:12-18.)

As Officer Kocian approached 22nd and O streets, he heard a second dispatch that the individual with the gun was just leaving the liquor store, and Officer Kocian saw an individual who matched the physical description in the first dispatch. Officer Kocian did not see him exit the store, but first saw the man when he was ten feet north of the store, walking toward a white vehicle. (Tr. 6:6-7:18; 18:6-7.) At this point, Officer Kocian knew only that a witness had called the police. He did not know the identity of the witness. (Tr. 17:8-17.) Though the officers did not then know it, the complaining witness had left a telephone number when she called police. (Tr. 48:3-12.)

Officer Kocian approached the man (who later proved to be Janigon) when he was about thirty feet north of the liquor store. Officer Kocian ordered Janigon to put his hands up, asked if he had a weapon and patted him down. Janigon was cooperative, and denied ever having a weapon. The patdown revealed no weapon on Janigon's person. (Tr. 18:8-19:4.) At most two minutes had elapsed from the first dispatch to the patdown. (Tr. 19:18-23.) Janigon conceded at the suppression hearing that "this was a proper Terry stop and frisk." (Tr. 66:18-19.)

Other officers arrived almost simultaneously with Officer Kocian. Officers Smith and Riffey arrived right after Officer Kocian. Officer Hanson and the recruit officer with whom he was working that night (Officer Vulmer) arrived last. (Tr. 24:24-25:12.) Officer Riffey contacted the persons in a white Mercedes parked fifteen to twenty yards northwest of the liquor store, in an open area on the street with

traffic driving by. Officer Hanson joined Officer Riffey. (Tr. 25:15-26:4; 27:15-22.) While Officer Riffey spoke to the two occupants (one in the driver's seat and one in the driver's side back seat), Officer Hanson helped cover them. (Tr. 26:7-10.) Officer Riffey asked the occupants to exit the car. Although the back seat passenger got out immediately, the driver began to exit but then quickly got back in the car. (Tr. 26:20-24.) Officer Hanson was standing right by the driver's side door, and "for officer safety reasons" removed the driver from the car since the dispatch call indicated a gun was involved and he did not know if the driver was reaching for a gun. (Tr. 27:6-9.)

As Officer Hanson was removing the driver from the white car, he saw a handgun on the passenger side floorboard. He yelled to the other officers that there was a gun in the car. (Tr. 10:14-15; 28:3-6; 28:21-22.) The two men removed from the vehicle were placed in handcuffs, so that officers could safely pat them down and search them without risk from that gun or other weapons. (Tr. 28:22-29:8.) After the two men were handcuffed and secured (the driver in a cruiser, and the passenger seated on the sidewalk), Officer Hanson retrieved the gun, which was black and tan. (Tr. 28:7-9; 29:12-17.) Following that, he searched the entire passenger compartment and found no other weapons, no wallet and no "Walkman." (Tr. 30:2-20.)[1]

When Officer Hanson yelled that there was a gun in the white car, Officer Kocian and Officer Riffey immediately handcuffed Janigon. (Tr. 10: 19-24.) Officer Kocian testified that in his opinion, at the time he handcuffed Janigon, Janigon was placed under arrest for carrying a concealed weapon. (Tr. 10:25-11:13.) This occurred within approximately four minutes of the first dispatch that a man with a handgun had entered the liquor store. (Tr. 20:10-17.) After Janigon was handcuffed,

---

[1]Later, and at two different times, Janigon gave varying reasons for reaching down his sweatpants while in the liquor store: to retrieve his wallet and to retrieve his "Walkman".

he was placed in Officer Riffey's cruiser. Officer Kocian asked Janigon questions to determine his identity (Janigon had no identification with him), but asked no questions about the gun. (Tr. 11:21-12:5.) Janigon gave at least three different names. A police computer search revealed that the final name he gave was the alias of someone with a "lengthy criminal history." (Tr. 13:6-14-8.) This questioning took fifteen to twenty minutes from the time Janigon was first placed in the cruiser. (Tr. 14:12-20.) Officer Smith was with Officer Kocian until Janigon had been secured in the cruiser. At that point, Officer Smith went inside the liquor store to gather more information. (Tr. 46:24-47:3.)

After the two men in the white car were handcuffed and secured, Officer Riffey saw an open container of beer in the front driver's side of the car, cited the driver for that offense and released him. In response to Officer Riffey's questions, the driver stated that the gun was his but asserted he did not know it was in the car, and said the man in the sweatpants (Janigon) was his father. (Tr. 36:14-24.)

As Officer Riffey was talking to the driver of the car, and Officer Hanson was searching the white car, Officer Smith went inside the liquor store and questioned the manager. The manager reported that Janigon and another man had been inside the store, one aisle away from him, apparently selecting beer. The manager saw Janigon reach toward the right leg of his sweatpants as though something had dropped down it, and then walk out of the store. The other man stayed inside the store. After a short time, Janigon came back into the store. (Tr. 47:2-21.) Officer Smith then called dispatch to see whether the original reporting witness would come to the store to talk to him. Dispatch had retained that witness's phone number, so someone from dispatch called the witness and she came to the liquor store. (Tr. 47:23-48:12.) Officer Smith interviewed her inside the store.

The female witness told Officer Smith that she was in a car with three friends, and her friends entered the liquor store to make a purchase while she remained in the

car. While in the car, she saw a white Mercedes pull into the liquor store parking lot and watched Janigon and another man exit the white Mercedes and enter the store. Shortly after that, she saw Janigon come out of the store, digging at something around his waistband. As Janigon walked toward the white car, she saw what she believed to be "a black handgun with some brown on it" in Janigon's hand. (Tr. 49:21-50:12.) She had not seen the gun as Janigon walked into the store, and initially did not see the gun as he walked out of the store. The witness first saw the gun as Janigon switched the handgun from one hand to the other as he approached the white car. After she saw Janigon handle the gun, she watched him sit in the front passenger seat of the white Mercedes before he walked back into the liquor store. (Tr. 50:13-51:6.) She called police at that point. She and her friends left.

At some point in the course of the investigation, and likely after he had interviewed the liquor store manager and the witness who called police, Officer Smith decided he should move the cruiser in which Janigon was seated because that cruiser was blocking much of the parking for the liquor store. While Officer Smith was moving the cruiser, Janigon "commented that he had a Walkman and it had dropped down his leg which [Officer Smith] assumed he was referring to what he grabbed at when it dropped down his pant leg inside the store." (Tr. 51:23-25.) Officer Smith had asked Janigon no questions and this statement was "just a volunteered comment . . . ." (Tr. 52:2-5.)

Officer Riffey gave Janigon Miranda warnings at 12:44 a.m., about forty-five minutes after the first dispatch call was broadcast. (Tr. 37:6-13.) By the time Janigon was Mirandized, officers had already talked to the store manager and to the witness who called with the tip. Janigon stated that he did not want to talk to Officer Riffey until they arrived at the jail, and Officer Riffey ceased questioning him. (Tr. 38:25-39:4.)

Officer Riffey transported Janigon to the jail, took him to booking, and met him again in an interview room. There she initiated an interview. (Tr. 40.) Janigon stated that the gun was not his, he had not seen the gun although he was riding on the front passenger side, and he knew nothing about how the gun got in the vehicle. He stated that his wallet had fallen down his pants leg, implying that this happened while he was inside the liquor store. (Tr. 40:8-41:12.)

In summary, Janigon was initially stopped because he matched the description of a man entering Mum's liquor store with a handgun at approximately midnight, who had arrived in a white car carrying other passengers. Almost simultaneously, the two passengers in a white car in the liquor store parking lot were approached. Janigon was patted down and no weapon was found on his person. A handgun was found on the floor of the white vehicle, and Janigon and the vehicle passengers were handcuffed. Janigon was placed in a police cruiser. The officer who handcuffed Janigon held the subjective belief that Janigon was arrested when he was handcuffed and placed in the cruiser. No one asserts that there was probable cause to arrest at that time. While Janigon was in the cruiser and in handcuffs, he was asked identification questions but was *not* questioned about the gun. He remained in the cruiser for no more than forty minutes. Sometime during that period, Janigon volunteered a statement to the effect that he reached down his pants to retrieve a wallet which had fallen inside his sweatpants. By the conclusion of the forty minute period, and after on-the-scene interviews of the liquor store manager and a witness, officers had developed probable cause to arrest Janigon for carrying a concealed weapon.[2] The search of the white car revealed no wallet. An officer gave him Miranda warnings at the scene (forty-five minutes after the first dispatch call), Janigon stated that he did not want to talk until he was at the jail, and while at the jail

---

[2]Though the laws on carrying concealed weapons in Nebraska have changed since then, at the time it was unlawful to carry a concealed weapon. Janigon does not seriously dispute that probably cause was lacking at time when he was Mirandized. Rather, he asserts that probable cause was needed earlier–when he was handcuffed.

Janigon stated that he reached inside his pants to retrieve a Walkman. A search of the white car at the scene produced no Walkman.

## *II.*

Janigon seeks to suppress the statements he made regarding his identification after he had been handcuffed, the statement he volunteered while the police cruiser was moved ("I was reaching for my wallet"), the statement he made after receiving a Miranda warning and while at the jail ("I was reaching for my Walkman"), as well as the gun. (Tr. 60:20-61:6.) The Magistrate Judge recommends denial of the motion. Janigon objects to the Recommendation, asserting that the Magistrate Judge erred (1) in concluding that Janigon was not under arrest at the time he was handcuffed and placed in the cruiser and (2) in failing to consider whether Janigon's statements were an act of freewill sufficient to purge the primary taint of his unlawful detention. (Filing 32.) I conclude that the Recommendation must be adopted and the motion to suppress must be denied, for the following reasons.

Janigon concedes that his initial stop was a valid investigative stop. "An investigative detention may turn into an arrest if it 'lasts for an unreasonably long time or if officers use unreasonable force.'" United States v. Maltais, 403 F.3d 550, 556 (8th Cir. 2005) (quoting United States v. Navarrete-Barron, 192 F.3d 786, 790 (8th Cir. 1999), cert. denied, 126 S. Ct. 1345 (2006). Here, neither the use of handcuffs nor the length of detention in handcuffs was unreasonable.

Handcuffing Janigon (and the other two occupants of the vehicle) was necessary to protect the personal safety of the officers and the general public near the liquor store, as they had reasonable suspicion that a midnight armed robbery of a liquor store had just been aborted or thwarted and needed to locate and secure any weapons. The use of handcuffs did not convert the Terry stop into an arrest. United States v. Bell, No. 06-2985, 2007 WL 895872, at *3 (8th Cir. March 27, 2007) (when

officers had informant's tip that she saw guns earlier stolen in a burglary being sold out of apartment, and saw other guns in a car identified by make and model that was parked near apartment, officers' actions in handcuffing investigative detainees were reasonably necessary to "protect the status quo, protect the officers, and allow them to conduct a limited search of the vehicle immediately and without interference.").

Janigon was handcuffed for less than forty-five minutes, and during this entire time, police officers were actively investigating. The length of his detention was reasonable under the circumstances and did not convert his initially lawful detention into a de facto arrest. See, e.g., Maltais, 403 F.3d at 557 (detention in patrol car for somewhere between ninety minutes and two hours not unlawful, as detaining officer was not dilatory in getting drug dog to remote, isolated area); United States v. White, 42 F.3d 457, 460 (8th Cir. 1994) (eighty minute wait for drug dog reasonable). The subjective belief of the officer who handcuffed Janigon that handcuffing him and detaining him in the patrol care constituted arrest is irrelevant. United States v. Pratt, 355 F.3d 1119, 1124 (8th Cir. 2004) (when applicable search standards depended on whether suspect was arrested or stopped, subjective belief of officers that individual was not arrested was irrelevant).

As I find that Janigon was not detained unlawfully, there is no need to consider whether the Magistrate Judge erred in failing to consider whether the taint was purged from evidence obtained during the allegedly unlawful detention.

For the foregoing reasons,

IT IS ORDERED:

1.  The Magistrate Judge's Recommendation (filing 29) is adopted;

2.  The objection to the Recommendation (filing 32) is denied;

3. The motion to suppress (filing 18) is denied; and

4. The Clerk of Court shall provide a copy of this Memorandum and Order to the assigned Magistrate Judge.

April 17, 2007  BY THE COURT:

*s/Richard G. Kopf*
United States District Judge